UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

CHRISTINE GUPTILL

                    Plaintiff,

          v.                                    **REPORT AND RECOMMENDATION**
                                                **5:08-CV-0077 (NAM)**

MICHAEL J. ASTRUE
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant,

## I.    Introduction

Plaintiff Christine Guptill brings this action pursuant to the Social Security Act

("the Act"), 42 U.S.C. §§ 405(g), 1383(c)(3), seeking review of a final decision of the

Commissioner of Social Security  ("Commissioner"), denying her application for

disability insurance benefits ("DIB").[1]

## II.    Background

On May 11, 2005, Plaintiff, then 53 years old, filed an application for DIB,

claiming disability since December 31, 2003,[2] because of a back impairment, injured

knees, high blood pressure, heart stents, depression, anxiety, and a pinched nerve in

her neck (R. at 47-51, 75, 101).[3] Her application was denied initially on July 8, 2005 (R.

at 27-30). Plaintiff filed a timely request for a hearing on August 18, 2005 (R. at 31).

On June 12, 2007, Plaintiff and her attorney appeared before the Administrative

Law Judge ("ALJ") (R. at 416-459).The ALJ considered the case *de novo* and, on

---

[1] This case was referred to the undersigned for Report and Recommendation, by the Honorable Norman A. Mordue, pursuant 28 U.S.C. § 636(b)(1)(B), by an Order dated September  1, 2009.
[2] Plaintiff initially alleged that her disability onset date was February 15, 1999, but her attorney amended the alleged onset date to December 31, 2003 in a letter to the ALJ because "[t]he claimant's retroactive benefits under Title II would be limited to 17 months prior to the May 2005 filing date, or December 2003." (R. at 101).
[3] Citations to the underlying administrative record are designated as "R."

August 31, 2007, issued a decision finding Plaintiff was not disabled (R. at 13-26). The ALJ's decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review on November 21, 2007 (R. at 5-7). On January 16, 2008, Plaintiff filed this action disputing her disability determination.

Pursuant to General Order No. 18, issued by the Chief District Judge of the Northern District of New York on September 12, 2003, this Court will proceed as if both parties had accompanied their briefs with a motion for judgment on the pleadings.[4]

### III.   Discussion

#### A.  Legal Standard and Scope of Review

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383 (c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); see Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).   "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant

---

[4] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings . . . ." General Order No. 18. (N.D.N.Y. Sept. 12, 2003).

evidence as a reasonable mind might accept as adequate to support a conclusion."

Richardson v. Perales, 402 U.S. 389, 401 (1971). Where evidence is deemed

susceptible to more than one rational interpretation, the Commissioner's conclusion

must be upheld. See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

      "To determine on appeal whether the ALJ's findings are supported by substantial

evidence, a reviewing court considers the whole record, examining evidence from both

sides, because an analysis of the substantiality of the evidence must also include that

which detracts from its weight." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258

(2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must

be sustained "even where substantial evidence may support the plaintiff's position and

despite that the court's independent analysis of the evidence may differ from the

[Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other

words, this Court must afford the Commissioner's determination considerable

deference, and may not substitute "its own judgment for that of the [Commissioner],

even if it might justifiably have reached a different result upon a *de novo* review."

Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

      The Commissioner has established a five-step sequential evaluation process[5] to

---

[5] The five-step process is detailed as follows:
 First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth

determine whether an individual is disabled as defined under the Social Security Act.
See 20 C.F.R. §§ 416.920, 404.1520. The United States Supreme Court recognized the
validity of this analysis in Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287,
2291, 96 L. Ed. 2d 119 (1987), and it remains the proper approach for analyzing
whether a claimant is disabled.

While the claimant has the burden of proof as to the first four steps, the
Commissioner has the burden of proof on the fifth and final step. See Bowen, 482 U.S.
at 146 n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984). The final step of this inquiry
is, in turn, divided into two parts. First, the Commissioner must assess the claimant's job
qualifications by considering his physical ability, age, education, and work experience.
Second, the Commissioner must determine whether jobs exist in the national economy
that a person having the claimant's qualifications could perform. See 42 U.S.C. §
423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460, 103 S.
Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

Based on the entire record, the Court recommends remand because the ALJ's
rejection of the diagnoses and opinions of the treating physician and treating
psychiatrist were not supported by substantial evidence and led to other errors in the
ALJ's analysis.

### B.  Analysis

#### 1.      The Commissioner's Decision

---

inquiry is whether, despite the claimant's severe impairment, he has the residual functional
capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the
[Commissioner] then determines whether there is other work which the claimant could perform.
Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also Rosa v. Callahan, 168 F.3d
72, 77 (2d Cir. 1999); 20 C.F.R. §§ 416.920, 404.1520.

4

The ALJ concluded that Plaintiff's alleged onset date was December 31, 2003 and that her date last insured was March 31, 2004 (R. at 15). In order to be entitled to a period of disability, Plaintiff would have to establish that her disability began on or before her date last insured. However, the ALJ concluded that claimant was not under a disability, as defined under the Act, at any time from December 31, 2003 through March 31, 2004 (R. at 15).

In reaching this conclusion, the ALJ followed the sequential evaluation. At step one, he concluded that Plaintiff had not engaged in substantial gainful activity at any time from her alleged onset date through her date last insured (R. at 17). At step two, the ALJ found that as of her date last insured, Plaintiff had the following severe impairments: "lumbar disc disease at multiple levels and a bulge and foraminal stenosis at L5-S1" (R. at 17). The ALJ also considered the following impairments, but found them non-severe: left knee injury, heart stents, right knee injury, depression, and anxiety (R. at 18-19). In finding that Plaintiff had no medically determinable mental impairment, the ALJ considered the opinions of Plaintiff's primary physician, Caroline Keib, M.D., that Plaintiff suffered from depression and anxiety, but granted the opinions "minimal weight" because they were not supported by Dr. Keib's treatment notes or other evidence in the record (R. at 18-19). The ALJ gave "no weight" to the opinions of Plaintiff's treating psychiatrist, Dr. Lawrence B. Hurwitz, M.D., who also diagnosed Plaintiff with depression and anxiety, because he did not begin treating Plaintiff until 2007, "well after the claimant's date last insured" (R. at 19). The ALJ also considered Plaintiff's subjective complaints of depression and panic attacks, but did not assess the plaintiff's credibility concerning those complaints because he found no medically determinable

5

impairment which could reasonably cause such symptoms (R. at 19). At the third step, the ALJ concluded that Plaintiff's impairments did not meet a Listing (R. at 19). At step four, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to lift and carry twenty pounds occasionally, and ten pounds frequently, to stand or walk six hours in a workday, to sit six hours in a workday, and to occasionally climb, balance, kneel, crouch, crawl, and stoop (R. at 19). The ALJ also considered Plaintiff's allegations that she was unable to sit or stand too long, unable to bend or climb stairs, and had difficulty lifting and reaching (R. at 20). The ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause such symptoms, but that her statements concerning their intensity, persistence, and limiting effects were "not entirely credible" for the period before her date last insured (R. at 22). In reaching Plaintiff's RFC, the ALJ also weighed the opinions of Plaintiff's treating orthopedic specialist, John J. Cambareri, M.D., that Plaintiff had a "moderate permanent partial disability" and the opinion of Worker's Compensation examining orthopedic specialist, Joseph Ortiz, M.D., that Plaintiff had a "marked" disability (R. at 21). In weighing these two opinions, the ALJ gave greater weight to Dr. Cambareri because he was a treating source and an orthopedic specialist (R. at 23) and he gave no special weight to Dr. Ortiz because his opinions were formulated for Workers' Compensation. The ALJ further concluded that Dr. Cambareri's opinions were consistent with the ability to perform work at the light exertional level with postural limitations as described above (R. at 23). Also at step four, the ALJ found that through her date last insured, Plaintiff could perform her past work as a pharmacy technician, medical secretary or surgical technician, either as was generally performed or as she actually performed them (R. at

6

23-24). At step five, with the assistance of testimony from vocational expert ("VE") Victor

G. Alberigi, the ALJ found that considering Plaintiff's RFC and vocational factors, she

could perform other work in the national economy such as receptionist, new or change

account clerk, and order clerk (R. at 25). Based on the above, the ALJ concluded that

Plaintiff was not disabled within the meaning of the Act "at any time from December 31,

2003, the amended alleged onset date, through March 31, 2004, the date last insured"

(R. at 25).

### 2.    Plaintiff's Claims

Plaintiff argues that (a) the ALJ improperly found that Plaintiff's mental

impairments were non-severe because he failed to properly weigh Dr. Keib's opinions

under the treating physician rule; (b) the ALJ did not apply the proper legal standard

when assessing Plaintiff's credibility; and (c) the RFC determination was not supported

by substantial evidence. Plaintiff's Brief, pp. 19-24.

### a.    The ALJ's Rejection of the Treating Physician's Opinions was not Supported by Substantial Evidence

Plaintiff argues that the ALJ's finding that Plaintiff did not have a severe mental

impairment on or before March 31, 2004 was not supported by substantial evidence

because the ALJ did not assign appropriate weight to Dr. Keib's opinions under 20

C.F.R. § 404.1527(d). Plaintiff's Brief, p. 19.

Under the treating physician rule, a treating physician's opinions are entitled to

controlling weight as long as the opinions are "well-supported by medically acceptable

clinical and laboratory diagnostic techniques" and "not inconsistent with the other

substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2).

After carefully reviewing the evidence, the Court concludes that substantial evidence does not support the ALJ's finding that Dr. Keib's opinions did not deserve controlling weight under the treating physician rule. Because the ALJ rejected Dr. Keib's opinions, he concluded that Plaintiff did not have a medically determinable mental impairment, despite ample evidence to the contrary. This conclusion is also unsupported by the record. The Court notes that the ALJ compounded these errors by failing to properly consider the opinions of Plaintiff's treating psychiatrist, Dr. Lawrence Hurwitz, and failing to properly consider Plaintiff's subjective statements about her symptoms—all of which were consistent with Dr. Keib's opinions. In light of these errors, the Court recommends remand so that the ALJ may properly consider the treating physician's opinions and diagnoses, along with the remaining evidence of record.

Specifically, on several occasions, Dr. Keib diagnosed Plaintiff with depression and anxiety dating back to at least September 2002, when Dr. Keib began treating Plaintiff (R. at 334, 337, 371). On March 18, 2007, Dr. Keib completed a medical source statement indicating that Plaintiff's anxiety related back to her son's death, over a decade ago (R. at 332). She assessed Plaintiff's prognosis as poor "as little change [was] seen over the years" (R. at 332). If Plaintiff were to be in a competitive work environment, Dr. Keib opined that Plaintiff's symptoms would increase and that Plaintiff could not do a full-time job (R. at 333-34). Dr. Keib concluded that Plaintiff's symptoms would frequently be severe enough to interfere with attention and concentration and that Plaintiff was incapable of even low stress work because of her "severe anxiety" (R. at 334). Plaintiff's impairments would cause her to be absent from a job more than three times a month, Dr. Keib estimated (R. at 334). Finally, Dr. Keib assessed Plaintiff with a

8

GAF[6] score of fifty through forty-one, which indicates serious symptoms or serious

impairment of functioning (R. at 336). Also on March 28, 2007, Dr. Keib wrote a letter

opining that Plaintiff was "disabled from working due to her severe and longstanding

anxiety and depression" (R. at 337). On June 14, 2007, Dr. Keib stated in a letter: "I am

the primary provider for Christine Guptill. I have followed her since 9/2002. At our initial

visit she complained of depression, and was indeed on Wellbutrin[7] at that time. Thus,

she has had a depression for as long as I've known her since 2002" (R. at 371).

> The ALJ considered Dr. Keib's opinions but concluded:

> Dr. Keib's treatment notes do not support this assessment (Exhibit 35F).
> While the record evidences subjective complaints of depression and
> anxiety symptomology, it is void of corresponding clinical findings (Exhibit
> 35F). Furthermore, the claimant reported improvement with the
> medications prescribed by her primary care physician, and declined
> treatment by a mental health provider (Exhibit 35F). Because Dr. Keib's
> opinions as to a mental impairment are not supported by her treatment
> notes or the other evidence of record, Dr. Keib's opinions were given
> minimal weight regarding the period at issue.

(R. at 18-19). After carefully reviewing the record, the Court concludes that the ALJ's

reasoning is flawed in several respects and unsupported by the record. The Court will

address each of the ALJ's reasons in turn.

> With respect to Dr. Keib's use of Plaintiff's subjective complaints, the Second

Circuit has repeatedly found that a patient's complaints or reports of her history are "an

essential diagnostic tool." <u>Burgess v. Astrue</u>, 537 F.3d 117, 128 (2d Cir. 2008) (<u>quoting</u>

---

[6] GAF refers to a psychological assessment scale, formally known as a Global Assessment of
Functioning ("GAF"). The GAF scale ranks psychological, social, and occupational functioning on a
continuum of mental health, from 1 to 100, where the higher numbers indicate superior functioning. A
GAF score of 41 to 50 indicates "serious symptoms OR any serious impairment in social, occupation, or
school functioning." <u>Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision</u>
34 (Am. Psychiatric Ass'n, 4th ed. 2000) (hereinafter <u>DSM-IV-TR</u>).
[7] Wellbutrin is a preparation of bupropion hydrochloride indicated for the treatment of major depressive
disorder. <u>Physicians' Desk Reference</u> 1719 (64th ed. 2010) [hereinafter <u>PDR</u>].

Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003)) (referring to "a patient's
report of complaints, or history, as an essential diagnostic tool.");  Green-Younger, 335
F.3d at 107 (quoting Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997)) (stating that
"a patient's report of complaints, or history, is an essential diagnostic tool."). As an
"essential diagnostic tool," Dr. Keib was entitled to also rely upon Plaintiff's subjective
complaints and doing so hardly undermines her opinions.

      The fact that Plaintiff reported improvement with medication was similarly
misplaced. A review of the evidence shows that although Plaintiff initially reported some
improvement with a new medication, her improvement was never sufficient to either
eliminate or properly manage her symptoms. Rather, the record shows that Dr. Keib
repeatedly increased Plaintiff's dose or changed Plaintiff's medication (R. at 375-90).
For example, on October 14, 2002, Dr. Keib noted that Plaintiff's depression was "better
with Lexapro"[8] (R. at 388), but on October 28, 2002 Plaintiff presented in the office
crying and "clearly upset" with symptoms of difficulty sleeping, crying spells, lack of
motivation, inability to get out of bed or out of the house, and panic attacks that
prompted Dr. Keib's nurse practitioner to switch Plaintiff's medication to Effexor[9] and
Xanax[10] (R. at 387). Similarly, from late 2003 through early 2004, Dr. Keib was
prescribing Zoloft,[11] but increased Plaintiff's dose at least three times over several visits
(R. at 379-80). At various times, Dr. Keib prescribed Wellbutrin, Lexapro, Effexor,

---

[8] Lexapro is a preparation of escitalopram oxalate indicated for use in the treatment of major depressive
disorder in adults. Id. at 1160.
[9] Effexor is a preparation of venlafaxine hydrochloride indicated for use in the treatment of major
depressive disorder. Id. at 3504.
[10] Xanax is generically known as alprazolam and indicated for managing anxiety disorder or short term
relief of symptoms of anxiety.  Id. at 2334.
[11] Zoloft is a preparation of sertraline hydrochloride indicated for use in the treatment of major depressive
disorder in adults. Id. at 2334.

Xanax, Zoloft, Prozac,[12] and Cymbalta,[13] often increasing Plaintiff's dosage before switching to an alternative (R. at 333, 375-90); see also (R. at 333) (Dr. Keib stated that she had "tried various [selective serotonin reuptake inhibitor]s [and] antidepressants" to reduce Plaintiff's symptoms). Based upon this evidence, the Court cannot agree that Plaintiff's occasional improvement with medication negated Dr. Keib's opinions.

The ALJ also discredited Dr. Keib's opinions because Plaintiff refused to seek counseling for several years (R. at 19). The record indicates that although Dr. Keib repeatedly urged Plaintiff to seek counseling and therapy, Plaintiff felt that she had "exhausted those possibilities [as] [s]he has tried them many times and never felt that they have been really helpful" (R. at 387). The regulations state that a claimant's disability benefits will be denied, or ceased if (a) the claimant fails to follow a course of treatment prescribed by the claimant's physician; (b) the treatment can restore the claimant's ability to work; and (c) the claimant does not have a "good reason" for refusing as enumerated in the regulations. 20 C.F.R. §§ 404.1530(a)-(b). The Court notes that it is not clear that counseling was a treatment actually "prescribed" by Dr. Keib. See (R. at 387) (encouraging Plaintiff to seek counseling); (R. at 385) (giving Plaintiff the name of two counselors); (R. at 384) (recommending Plaintiff see a counselor); (R. at 380) (strongly encouraging therapy); (R. at 379) (noting that Plaintiff still "does not want to pursue any counseling"); (R. at 375) (discussing psychiatrist appointments and contacting Plaintiff's sister to help Plaintiff call the recommended psychiatrist). Moreover, the regulations do not provide authority for the premise that a

---

[12] Prozac is a preparation of fluoxetine hydrochloride indicated for acute and maintenance treatment of major depressive disorder. Id. at 1941.
[13] Cymbalta is a preparation of duloxetine hydrochloride indicated for the treatment of major depressive disorder. Id. at 1871.

failure to seek a particular treatment—prescribed or otherwise—is a reason to discount a treating physician's opinion. 20 C.F.R. §§ 404.1530(a)-(b); see 20 C.F.R. § 404.1527(d)(2) (explaining the two reasons an ALJ may decline a treating physician's opinion controlling weight: that it is not well-supported by diagnostic techniques or that it is inconsistent with other substantial evidence). Therefore, Dr. Keib's opinion could not properly be rejected because Plaintiff did not seek counseling for several years despite her urging. Moreover, it seems illogical for the ALJ to discredit Dr. Keib's opinions concerning plaintiff's depression and anxiety and yet conclude that Dr. Keib's repeated recommendations of therapy and Plaintiff's repeated refusals were evidence that Plaintiff's depression was non-existent or not as severe as Dr. Keib reported. The ALJ cannot have it both ways.  Rather, Plaintiff's avoidance seems consistent with the lack of interest, motivation, and energy that characterizes depression and is corroborative of Dr. Keib's diagnosis and treatment of Plaintiff's condition of depression and anxiety.[14]

Finally, with respect to the ALJ's reasoning that Dr. Keib's "treatment notes do not support" her assessments, that the record "is void of corresponding clinical findings," and that "other evidence of record" does not support Dr. Keib's opinions (R. at 18-19), substantial evidence does not support these conclusions. To the contrary, a review of the record shows that Dr. Keib's treatment notes, Dr. Hurwitz's opinions, and Plaintiff's own statements all support Dr. Keib's diagnoses and opinions.

Dr. Keib's treatment notes document that Plaintiff experienced multiple symptoms of depression. The Court takes notice that a diagnosis of Major Depressive Disorder includes experiencing five or more of the following symptoms for at least two

---

[14] The diagnostic criteria for major depression includes depressed mood, markedly diminished interest or pleasure in activities, and loss of energy. DSM-IV-TR 356, 375 (Am. Psych. Assoc. 4th ed. 2008).

weeks: depressed mood; markedly diminished interest or pleasure in activities;

significant weight loss or weight gain; insomnia or hypersomnia; psychomotor agitation

or retardation; fatigue or loss of energy; feelings of worthlessness or excessive or

inappropriate guilt; and recurrent thoughts of death. DSM-IV-TR 356, 375 (Am. Psych.

Assoc. 4th ed. 2008); see also 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04(A)(1)(a)-(h)

(describing depression of Listing level severity to include at least four of the following:

pervasive loss of interest in almost all activities; appetite disturbance or change in

weight; sleep disturbance; psychomotor agitation or retardation; decreased energy;

feelings of guilt or worthlessness; difficulty concentrating or thinking; or thoughts of

suicide). The symptoms must also cause clinically significant distress or impairment in

social, occupational, or other areas of functioning. Id. at 356. Dr. Keib's treatment notes,

which span a period from September 3, 2002 through November 10, 2004, show that

Plaintiff experienced depressed mood (R. at 375, 379-80, 385, 387); difficulty leaving

the house, getting out of bed or off the couch, getting out of her pajamas, making dinner

for her husband, doing any housework, and even keeping doctors appointments (R. at

375, 377, 379-80, 385, 387); occasional difficulty sleeping (R. at 379, 387); frequent

lack of energy (R. at 375, 380, 385, 387); crying episodes (R. at 375, 380, 386-87);

episodes of panic or anxiety (R. at 377, 382, 386-87); and some weight gain (R. at 375-

90) (showing Plaintiff went from weighing 150 pounds to 177 lbs over a two year period

with a ten pound weight gain in a one month period).

  Defendant argues that during the relevant time period, Plaintiff "underwent no

formal mental status exams." Defendant's Brief, p 16. While Dr. Keib's notes have no

sections labeled "mental status exam" ("MSE"), the Court concludes that the substance

of Dr. Keib's notes establish the necessary clinical diagnostic techniques.[15]  The Court

recognizes that MSEs are desirable in a complete medical report, see 20 C.F.R. §

404.1513(b) (indicating that a medical report should include "clinical findings (such as

the results of physical or mental status examinations)"). However, "[MSEs] are not

necessary to support the opinions of a treating physician if the physician's opinion is

otherwise supported by objective clinical findings." Bonet v. Astrue, 2008 WL 4058705,

at *2 (S.D.N.Y. Aug. 22, 2008). In this case, as in Bonet, Dr. Keib's treatment notes

contain her and her staff's observations, diagnoses, evaluations, and treatment plans,

sufficient to constitute the necessary clinical diagnostic techniques. Id.; 20 C.F.R. §§

404.1508; 404.1528(b); 404.1527(d)(2). Therefore, the Court concludes that the ALJ's

conclusion that Dr. Keib's opinions were lacking support from treatment notes or clinical

techniques is not supported by substantial evidence.

     In addition to Dr. Keib's treatment notes, the record contains a medical source

statement dated May 22, 2007 and a letter dated June 25, 2007, from Plaintiff's

psychiatrist, Dr. Hurwitz (R. at 356-59, 369-70). Dr. Hurwitz did not begin treating

Plaintiff until April of 2007 (R. at 356). For this reason, the ALJ gave his opinions "no

weight regarding the period at issue" (R. at 19). However, as the Second Circuit has

repeatedly observed:

     Evidence bearing upon an applicant's condition subsequent to the date
     upon which the earning requirement i.e., insured status was last met is

---

[15] The Court notes that if a treating source's opinions were not supported by clinical or laboratory
diagnostic techniques, the regulations required the ALJ to recontact that treating source to remedy the
gap in the record. See 20 C.F.R. § 404.1512(e)(1) ("We will seek additional evidence or clarification from
your medical source when the report from your medical source contains a conflict or ambiguity that must
be resolved, the report does not contain all the necessary information, or does not appear to be based on
medically acceptable clinical and laboratory diagnostic techniques.").

pertinent evidence in that it may disclose the severity and continuity of impairments existing before the earning requirement date or may identify additional impairments which could reasonably be presumed to have been present and to have imposed limitations as of the earning requirement date.

Lisa v. Sec'y of Dept. of Health & Human Servs., 940 F.2d 40, 44 (2d Cir. 1991)

(quoting Gold v. sec'y of Health, Educ. & Welfare, 463 F.2d 38, 41-42 (2d Cir. 1972)).

Therefore, the Court has carefully considered Dr. Hurwitz' opinions.

Dr. Hurwitz diagnosed Plaintiff with major depression and anxiety (R. at 356,

369). He described Plaintiff's symptoms as follows:

Severe depression and anxiety. Sleep disorder with difficulty falling asleep and awakening during the night. Poor appetite. Tearfulness. Difficulty with ability to focus or concentrate for any period of time. Fatigued. Experiences panic attacks. Difficulty coping with stress and pressure. She feels helpless, hopeless and guilty. Difficulty coping with pain related to knee and back, which also impacts sleep.

(R. at 356). Dr. Hurwitz also opined that Plaintiff's symptoms would increase in a

competitive work environment and that she could not do a full-time job on a sustained

basis (R. at 357-58). Dr. Hurwitz opined that Plaintiff's symptoms "constantly" interfered

with her concentration and attention and that she could not tolerate even "low stress"

work (R. at 358). He believed Plaintiff's impairments would cause her to miss work more

than three times a month (R. at 358). Dr. Hurwitz stated "This patient's condition is

severe. She is not able to productively function in a work environment. She is totally

disabled" (R. at 359). When asked the earliest date to which his opinions applied, Dr.

Hurwitz wrote "from this office 4-30-07," indicating the date he began treating Plaintiff

(R. at 358). The Court notes however that Dr. Hurwitz was not asked to review Dr.

Keib's treatment notes from 2002 and onward, which may have prevented him from

offering an opinion as to Plaintiff's condition prior to 2007.[16] However, in his letter, dated June 25, 2007, Dr. Hurwitz explained that Plaintiff's depression and anxiety were driven, in part, by her knee and back pain—physical impairments that the record indicates date back to the 1990s (R. at 369).

It is only logical that the persuasive power of Dr. Hurwitz' opinions and observations be tempered by the three years between Plaintiff's date last insured and the beginning of his treatment. Nevertheless, Dr. Hurwitz' diagnosis, observed symptomology, and opinions are remarkably similar to those of Dr. Keib. Compare (R. at 356-59, 369-70) with (R. at 332-37, 371, 375-90). Moreover, the record as a whole indicates that from 2002 onward, although Plaintiff's depressive symptoms would intermittently abate, they were never eliminated (R. at 375-90). See Lisa, 940 F.2d at 44 (explaining that subsequent evidence may disclose the "continuity of impairments existing before the earning requirement date"). In light of the above, the Court concludes that Dr. Hurwitz' opinions also support Dr. Keib's opinions.

Finally, Plaintiff's own statements support Dr. Keib's opinions. See 20 C.F.R. § 404.1529(a) ("In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence"). In a Function Report dated June 8, 2005, Plaintiff reported that her husband did the housework (R. at 89), her husband helped her wash her back, shave her legs, and clip her toenails (R. at

---

[16] The Court notes that if the ALJ felt that he did not have enough information on an issue, such as when Plaintiff's depression and anxiety dated back to, he could have recontacted Plaintiff's treating sources to clarify the issue. See 20 C.F.R. § 404.1512(e)(1) (explaining that a treating source will be recontacted when the report does not contain all the necessary information).

90), her husband helped her remember her medications (R. at 91), she had lost interest in going out of the house (R. at 92), she spent most days alone (R. at 93), was very easily distracted, lost her train of thought, and could not finish what she started (R. at 95). Plaintiff testified on June 12, 2007, "I'm just constantly overwhelmed with doing very little, if anything. I have my mom there for the last two years and between her and my husband, they do the meals and the laundry and I literally do absolutely nothing" (R. at 432). Plaintiff also testified that her mother and her husband care for all the household chores, indoors and outdoors, the shopping, and most of the driving (R. at 440-42). Although the ALJ did not assess the credibility of Plaintiff's depression and anxiety symptoms because he concluded the evidence did not "establish the existence of a medically determinable mental impairment" (R. at 19), the Court has considered Plaintiff's symptoms and concludes that Plaintiff's subjective complaints were also consistent with Dr. Keib's opinions and observations.

Finally, the Court notes that the only evidence that could possibly be considered supportive of the ALJ's rejection of Dr. Keib's opinions and his conclusion that Plaintiff did not have a medically determinable mental impairment does not constitute substantial evidence in this case. On June 29, 2005, State agency reviewing psychologist, Allan Hochberg, Ph.D., completed a psychiatric review technique indicating that there was "insufficient evidence" to find an affective disorder (R. at 250). Without more, Dr. Hochberg's analysis might be substantial evidence to support the ALJ's decision to reject Dr. Keib's opinion and find no medically determinable mental impairment. However, in this case, Dr. Hochberg found insufficient evidence two years before Dr. Keib submitted her treatment notes and two years before Dr. Hurwitz

17

provided his opinions. See (R. at 374-415) (including Dr. Keib's treatment notes in a set of forty-two pages submitted to the ALJ on July 26, 2007); (R. at 356-60) (Dr. Hurwitz' medical source statement dated May 22, 2007); (R. at 369-70) (Dr. Hurwitz' letter dated June 25, 2007). Therefore, Dr. Hochberg's opinion in this case cannot be considered substantial evidence in support of the ALJ's decision.

Based on the foregoing, the Court finds that substantial evidence does not support the ALJ's treating physician analysis with respect to Dr. Keib's opinions. The Court recommends remand so that Dr. Keib's opinions may be properly weighed under the treating physician rule, with appropriate consideration given to the evidence in her treatment notes, Dr. Hurwitz' opinions, and Plaintiff's statements.

Plaintiff also argued that the ALJ improperly failed to apply the special technique set out in 20 C.F.R. §404.1520a for assessing the severity of mental impairments. Plaintiff's Brief, p. 21. As the Court has already concluded that the ALJ erred in applying the treating physician rule and in concluding that Plaintiff did not have a medically determinable mental impairment, the ALJ's failure to apply the special technique is also necessarily flawed and must be redressed upon remand. See 20 C.F.R. §§ 404.1520a(b)(1)-(2) (explaining that the special technique first requires the ALJ to determine whether the is a medically determinable mental impairment, and then requires him to rate the claimant's degree of functional limitation).

### b.  The ALJ's Credibility Analysis is Necessarily Flawed

Plaintiff also argues that the ALJ failed to properly assess credibility under 20 C.F.R. § 404.1529. Plaintiff's Brief, pp. 23-24. The Court agrees that the ALJ's conclusion that Plaintiff did not have a medically determinable mental impairment

rendered his credibility analysis necessarily flawed because the ALJ failed to consider Plaintiff's subjective complaints regarding her mental impairments (R. at 15-26).

### c.  The ALJ's RFC Determination is Necessarily Flawed

Finally, Plaintiff raises several arguments objecting to the RFC. Plaintiff's Brief, pp. 21-22. Notably, when the ALJ included portions of Dr. Keib's and Dr. Hurwitz' opinions in the hypothetical—that the person was incapable of even "low stress" work and would be absent more than three times a month—the VE concluded that there would be no jobs in the national economy that such a person could perform (R. at 458-59). Therefore, the Court concludes that the RFC determination is also necessarily flawed by the ALJ's failure to properly evaluate the treating physician's opinion in light of the evidence of record.

### IV.    Conclusion

After carefully examining the administrative record, the Court finds the Commissioner's decision is not supported by substantial evidence. The ALJ rejected the opinions and diagnoses of Plaintiff's treating physician, Dr. Keib and her treating psychiatrist, Dr. Hurwitz, despite ample evidence supporting their conclusions. The ALJ's failure to credit Plaintiff's doctors led him to the unsupported conclusion that Plaintiff had no medically determinable mental impairment, led him to fail to properly assess Plaintiff's credibility, and led him to improperly state Plaintiff's RFC.

Based on the foregoing, it is respectfully recommended that the Commissioner's decision denying disability benefits be REMANDED for further proceedings in accordance with this recommendation and pursuant to sentence four of 42 U.S.C. Section 405(g).

Respectfully submitted,

Victor E. Bianchini
United States Magistrate Judge

DATED: April 28, 2010

       Syracuse, New York

## Orders

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

Thomas v. Arn, 474 U.S. 140 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir.1989); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir.1988).

**SO ORDERED**.

Victor E. Bianchini
United States Magistrate Judge

DATED: April 28, 2010
Syracuse, New York